UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KERRIE STONE, JUSTINA RODRIGUEZ, and FRANK BRIGHTWELL, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ADVANCE AMERICA, CASH ADVANCE CENTERS INC., et al.,<br><br>Defendants. | CASE NO. 08-CV-1549-AJB (WMc)<br><br>ORDER DENYING MOTION FOR CLASS CERTIFICATION, DENYING MOTION TO STRIKE, AND SETTING REMAINING PRETRIAL DATES<br><br>[Docs. 130, 142] |

Plaintiffs' motion to certify a class of consumers was fully briefed last year – before the case was transferred to the undersigned. [# 173] The Supreme Court's June 2011 decision in *Wal-Mart v. Dukes*, 131 S. Ct. 241 (2011), impacted Ninth Circuit case law. The Court heard argument on the first available date, November 14, 2011. For the reasons stated below, the Court DENIES Defendants' motion to strike the expert report of Dr. Krosnick, and DENIES Plaintiffs' motion to certify a class of Spanish-language claims.

**Background**

Plaintiffs Kerrie Stone, Justina Rodriguez, and Frank Brightwell are customers of Defendants Advance America, Cash Advance Centers of California, LLC, and its parent, Advance America, Cash Advance Centers Inc. Defendants provide short-term cash advances – commonly known as payday loans. The industry is regulated by the California

1  Deferred Deposit Transaction Law ("CDDTL").  Cal. Fin. Code § 23005.  Among other
2  requirements, the licensee must keep certain financial records, the governing agency may
3  conduct an audit, and, most important to this motion, the notice of rights and the written
4  agreement must be "in the language principally used by the customer."  *Id.* §§ 23024,
5  23046, 23035(f) & (g).  If a lender violates the CDDTL, it forfeits the fee collected.  *Id.* §
6  23064.  Other remedies include equitable relief (*e.g.*, injunction, disgorgement, restitution);
7  compensatory damages; treble damages; attorney's fees; and, if the violation is shown to be
8  willful, punitive damages.  *Id.*

9  Plaintiffs allege that Defendants' misconduct also constitutes unfair competition.
10 Cal. Bus. & Prof. Code § 17200 ("UCL").  California's UCL provides for an injunction or
11 other relief as necessary to restore money acquired by unfair competition.  *Id.* § 17203;
12 *ABC Int'l Traders, Inc. v. Matsushita Elec. Corp.*, 931 P.2d 290 (Cal. Sp. Ct. 1997)
13 (remedy includes restitution of money lost by plaintiff or gained by defendant as a result of
14 unfair competition); *cf. United States v. Sequel Contractors, Inc.*, 402 F. Supp. 2d 1142
15 (C.D. Cal. 2005) (compensatory damages are not available under § 17203).

16 Plaintiffs seek to certify a class defined as:  "All individuals who received a payday
17 loan from an Advance America branch in the State of California at any time since July 16,
18 2004 and who principally spoke Spanish in the discussion or negotiations leading to the
19 loan but whose payday loan documents were not in that language."  Pls.' Mot. at 2.

20 Rodriguez is the Class Representative for the proposed class.  The parties identified
21 54 loans.  Rodriguez recalls that she predominately spoke Spanish in 18 to 21 of those
22 transactions.  Defs.' Ex. 14.  All of her loan documents were in English.

23 Plaintiff proffers evidence to show that Defendants' liability can be determined on a
24 classwide basis.  *Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 485 n.7 (C.D. Cal.
25 2008). Plaintiffs submitted 25 declarations from frequent customers who state they
26 obtained payday loans at various branches, they principally spoke Spanish, they understand
27 very little or no English, but that none received documents in Spanish.  *E.g.*, Alejandrez
28 Dec.; Aviña Decl.; Cárdenas Decl.; Pls.' Supp. Decls. 1-5; *Dilts v. Penske Logistics, LLC*,

267 F.R.D. 625, 638 (S.D. Cal. 2010) (accepting declarations from drivers as sufficient evidence to certify a class). Defendants' employees estimated that 5% to 50% of the customers spoke Spanish during the transaction. *E.g.,* Defs.' Ex. J; Pls.' Ex. 5 (Madrid testified 40 to 60% spoke Spanish at Downey store). Employees did not understand the purpose of the policy to explain the terms first in English, even when the customer does not understand English. Defs.' Ex. L. At a Los Angeles branch, an employee told the investigator that Spanish forms were only available if the customer requested one, but that none of the tellers spoke Spanish. Defs.' Ex. Q; *see* Defs.' Ex. M; Pls.' Ex. 5 (Madrid Dep.).

The California Department of Corporations conducted periodic examinations and found violations of the language requirement for several Spanish-speaking customers in 2006, 2008, and 2009. Pls.' Exs. 32 (identifying two violations), 33 ("Our examination disclosed that the written agreement was not provided in the same language principally used in discussing and negotiating deferred deposit transactions with your Spanish-speaking customers."), & 34 (same, "at some licensed locations").

Plaintiffs presented evidence that Defendants advertise in Spanish in Hispanic neighborhoods and recruit bilingual employees because "it was just good business." Defs.' Ex. J; Pls.' Exs. 11 (Newman Dep.), 16 (Weisel Dep.), & 24 (media broadcast summary). Defendants opened 88 stores in predominately Hispanic neighborhoods. Pls.' Exs. 12 (Riedel Dep.) & 28.

In addition, Plaintiffs hired investigators to visit some of the 88 stores that received Spanish documents and to record the number of transactions conducted in a language other than English. The investigators observed employees giving English forms to customers who spoke more than 50% Spanish. *E.g.*, Defs.' Ex. O.

Plaintiffs' expert, Dr. Krosnick, took the data from those randomly selected visits and extrapolated that 23% of the transactions in the 88 stores are performed predominately in Spanish.

Defendants admit that they did not print their documents in Spanish until October

1  2009.  *See* Defs.' Exs. 2, 3, & 5 (Spanish forms dated May 2009); Pls.' Exs. 5 (Madrid
2  Dep.) & 11 (Newman Dep.).  In October 2009, Defendants distributed the Spanish forms to
3  88 of their 300 stores.  There is a sign stating, in Spanish, that the forms are available in
4  Spanish.  Defs.' Ex. 7 (Newman Depo. at 221).  However, Defendants argue that they have
5  always complied with the CDTTL because they have a corporate policy that requires the
6  employee to orally discuss the key terms of the loan with the customer in English.  This
7  policy is designed to ensure that the essential negotiations leading up to the loan are
8  communicated in English, even if a customer speaks some Spanish during the ten-minute
9  transaction.  Defs.' Ex. 7 (Newman Depo. at 198-200); *see* Defs.' Ex. 6 (Riedel Depo. at
10 69, 90-91).  If the employee also spoke Spanish, the employee would nonetheless explain
11 the terms first in English, and then a second time in Spanish.  Defs.' Ex. 7 (Newman Depo.
12 at 198-99); Defs.' Ex. 8 (Weisel Depo. at 40-41).  Defendants follow this same procedure
13 in stores that now have the Spanish language contracts.  Defs.' Ex. 7 (Newman Depo. at
14 198-99).  The employee has the discretion whether to provide the customer with a Spanish
15 or English form.  *Id.*  (Newman Depo. at 221-22); *but see* Defs.' Ex. 10 (Lazaro Depo. at
16 94-95) (stating that applications were on the counter, and the customer chose whether to
17 complete a Spanish version or an English version); Defs. Ex. 11 (Madrid Depo. at 70)
18 (same).
19      On the question of fact, Defendants dispute that Rodriguez primarily spoke Spanish
20 at the payday centers.  They note that Rodriguez was not able to consistently and reliably
21 identify which of the 54 loan transactions were conducted mainly in Spanish.  Employee
22 Adriana Lazaro states that Rodriguez always spoke English and that Rodriguez spoke better
23 English than she did.  Defs.' Ex. 10; *see e.g.*, Defs.' Exs. 19, 20, 21, 22, & 23.
24      This will be a bench trial.

### Discussion

26 **I. Defendants' *Daubert* Motion to Strike Dr. Krosnick's Expert Report**
27      Defendants attack the analysis conducted by Plaintiffs' expert, Dr. Krosnick, but not
28 his qualifications.  Krosnick concluded that Spanish was predominately spoken in 23% of

payday loan transactions.[1]  Defs.' Ex. A ¶¶ 11, 23.

### A. **Standard of Review in Context of Class Certification Motion**

District courts act as the gatekeeper for expert testimony by carefully applying Federal Rule of Evidence 702 to ensure the evidence is "not only relevant, but reliable." *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 589 (1993); *accord Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (*Daubert* imposed a special "gatekeeping obligation" on trial judge).  An expert witness may testify "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702; *see Cooper v. Brown*, 510 F.3d 870, 880 (9th Cir. 2007) (proponent of evidence bears burden of proving testimony satisfies Rule 702).  The court considers, among other pertinent questions, the known or potential rate of error and whether the technique has been subjected to peer review and publication. *Kumho Tire*, 526 U.S. at 149-53 (*Daubert* test is flexible and court has "broad latitude" to tailor factors to facts); *Daubert*, 509 U.S. at 593-95.  In addition, the court considers whether the evidence is a type that is reasonably relied upon by experts in the field. *Daubert*, 509 U.S. at 595 (citing Fed. R. Evid. 703).

The Ninth Circuit had held that the district judges were not required to apply the same level of scrutiny to expert testimony at the class certification stage; however, the Supreme Court, in *dicta*, disapproved of the district court's failure to apply a *Daubert* analysis to the expert's opinion on the class certification requirements in *Wal-Mart*, 131 S. Ct. at 2553-54, *rev'g, Dukes v. Wal-Mart*, 603 F.3d 571, 602-03 & n. 22 (9th Cir. 2010) (en

---

[1] In their briefs, which were filed before the *Wal-Mart* decision, Plaintiffs originally proposed to calculate damages using Krosnick's statistical evidence. Plaintiffs relied upon the Ninth Circuit's *Hilao* decision as one way to calculate damages for the class.  In that unique human rights case, a random sample of class members was selected, the expert calculated the percentage of valid claims in that sample, and that figure was used to extrapolate the average monetary award.  *Hilao v. Estate of Marcos*, 103 F.3d 767, 782-787 (9th Cir. 1996).  The Supreme Court, in *dicta*, disapproved the Ninth Circuit cases that allowed "trial by formula" to determine an employee's eligibility for back pay in a Title VII action. *Wal-Mart*, 131 S. Ct. at 2560-61.  The Supreme Court's disapproval of the *Hilao* method largely eliminates a "trial by formula" approach to use statistics to extrapolate average damages for an entire class, at least when the statute contains an individualized defense.

banc). The Supreme Court did not expressly require district courts to conduct a "full" *Daubert* analysis.[2] Thereafter, the Ninth Circuit stated a district court should apply the *Daubert* evidentiary standard to evaluate the reliability of expert testimony before turning to the rigorous Rule 23 analysis. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).

**B. Analysis**

Defendants have three main criticisms of the research method and analysis.[3]

First, Defendants object to the extensive involvement of Plaintiffs' counsel in designing the research method. Counsel hired an investigative company that has an ongoing business relationship with the law firm and the company knew the project was being prepared for litigation against the Defendants. Counsel created the log form and gave the instructions for recording information on the form. Plaintiffs' counsel also hired the statistician. Defendants argue that this level of attorney involvement creates an inference that the research was biased. *Pittsburgh Press Club v. United States*, 579 F.2d 751, 758-59 (3d Cir. 1978). Defendants further argue that it undercuts Krosnick's professional opinion. He cannot vouch for the reliability of the underlying data because he was not involved in the project design or sampling process. *Marlo v. United Parcel Serv.*, 251 F.R.D. 476, 485 (C.D. Cal. 2008).

The Court concludes that this argument impacts the weight of the evidence, but does not render Krosnick's expert opinion inadmissible. *Elm Grove Coal Co. v. Director*, 480

---

[2]Some courts have interpreted *Wal-Mart* to allow a "relaxed" or "lenient" *Daubert* analysis in the context of a class certification motion. *In re Zurn Pex Plumbing Prods. Liability Litig.*, 644 F.3d 604, 613-14 (8th Cir. 2011); *Fosmire v. Progressive Max Ins. Co.*, — F. Supp. 2d —, 2011 WL 4801915, at *2-3 (W.D. Wash. 2011); *but see Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 816-17 (7th Cir. 2010) (requiring a full *Daubert* review of class evidence at certification stage).

The Court expresses no opinion on that approach. Unlike the typical case when a motion to certify a class is filed early in the proceedings, this case is at an advanced stage. The parties have completed discovery, exchanged expert reports, and the pretrial conference is imminent. The Court conducts a full *Daubert* analysis now to avoid a duplicative motion *in limine*.

[3]The Court has considered all of Defendants' several arguments. To the extent this Order does not expressly discuss each point, the Court has rejected the argument for lack of merit.

F.3d 278, 301 n.23 (4th Cir. 2007). As Plaintiffs point out, the log form is very simple. Pls.' Ex. 5 to Lauinger Decl. After listing the date, store location, and time of the visit, the investigator recorded the gender of the customer, their ethnicity, a short description, and the "predominant" language spoken. The investigator also reported whether the store had Spanish sign posted in the lobby and whether any Spanish documents were available. The task was uncomplicated. An investigator entered a store and stayed unobtrusively in the lobby for thirty minutes. He or she observed loan transactions and made notes of the language predominately spoken. After leaving the store, the investigator transferred the basic facts onto the rudimentary log form. The investigators often wrote narratives on the bottom to explain their observations. The Court concludes that there was no need for an extensive protocol or a complicated coding method. The investigators acted independently, without any preconceived objective to reach a certain conclusion, and without attorney supervision. *E.g.*, Pls.' Exs. 1-4 to Lauinger Decl. The investigators did not need any technical knowledge to complete the assignment.

Next Defendants attack the research method as unreliable because it is based upon highly subjective data gathered by people with no scientific experience. Defs.' Ex. B ¶ 14 (expert report of Dr. Neal). When deposed, the investigators said the term "predominate" was not defined for them. Defendants argue this vague term allowed each investigator to apply his own subjective standard, thus, the underlying data lacks uniformity. *U.S. Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F. Supp. 2d 748, 754-55 (N.D. Ill. 2009). Further, the standard itself is highly subjective because of the range of English/Spanish language skills between the customers and the employees. In addition, there was no consistency. For instance, did the investigator measure from the start of the conversation, which may have included pleasantries, or did they evaluate only the part of the discussion related to the loan transaction? Data collection and statistical analysis must meet the generally accepted standards for objective, quantitative research. It is impossible to transform subjective facts into a broad, objective statistical projection. *Revlon Consumer Prods. Corp. v. Jennifer Leather Broadway, Inc.*, 858 F. Supp. 1268, 1276 (S.D.N.Y. 1994), *aff'd* 57 F.3d 1062 (2d

1 | Cir. 1995).

2 | The Court is not persuaded that these observations render Krosnick's testimony inadmissible. *Daubert*, 509 U.S. at 597 (expert testimony must "rest on a reliable foundation"). Plaintiffs presented sufficient evidence that personal observational research is a valid and widely used scientific method to measure certain issues, including social interactions and communication. Pls.' Ex. 10 ¶ 6 to Supp. Lauinger Decl. (rebuttal report). Krosnick's report lists dozens of scientific papers that have used the method. *Id.* (*e.g.*, brief observations of patients in waiting rooms and mental health units), Scientists often use forms prepared by others. *Id.* ¶ 8. The Court agrees with Plaintiffs that the method was sufficiently structured and reliable in the context of a straightforward, commonsense observation of whether the customer spoke more Spanish than English when taking out a payday loan. Although there is an evaluative aspect to determining the "principal" language spoken during the loan transaction, it is not completely subjective. It is possible to measure whether the conversation contained more Spanish words than English. Here, the investigators used the same standard used by the statute to make that observation. There may have been transactions in which this was a close call, that is, half Spanish and half English conversations, but the Defendants offer no alternative way to gather information to enforce the statute. They do not keep track of the language spoken. There is also merit to Plaintiffs' contention that the observation method is a more reliable method in this context than other alternatives (*e.g.*, directly asking customers questions after they left the store). *See id.* ¶ 9. Here, the observations were recorded at the same time the customers obtained the payday loan at the stores, and customers may not have been willing to answer a survey on a personal financial matter. In sum, Defendants' concern affects the weight of the evidence.

Defendants' third argument is that Krosnick's margin of error is so wide that his opinion is meaningless. Krosnick reported a plus or minus 18% margin of error. His conclusion of 23% actually indicates a huge range between 5% and 41%, which is inconclusive and invalid.

This criticism also goes to the weight of the evidence. Defs.' Ex. A ¶¶ 23, 27, 29. At trial, Defendants will be able to cross examine Krosnick and present their own expert witness to highlight any weaknesses in the potential rate of error. *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *United States v. Prime*, 431 F.3d 1147, 1153 (9th Cir. 2005).

## II. **Plaintiffs' Motion to Certify a Spanish Language Class**

### A. **Requirements of a Class Action**

"The class action is 'an exception' to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart*, 131 S. Ct. at 2550 (citation omitted). "Class action certifications to encourage compliance with consumer protection laws are 'desirable and should be encouraged.'" *Ballard v. Equifax Check Serv., Inc.*, 186 F.R.D. 589, 600 (E.D. Cal. 1999) (citations omitted); *see Abels v. JBC Legal Grp.*, 227 F.R.D. 541, 547 (N.D. Cal. 2005) (class action is superior when "[m]any plaintiffs may not know their rights are being violated") (citation omitted).

To obtain certification, a plaintiff bears the burden of proving that the class meets all four requirements of Rule 23(a) – numerosity, commonality, typicality, and adequacy – *and* falls within one of the three categories of Rule 23(b). *Ellis*, 657 F.3d at 979-80. This case involves the categories for an injunction, Rule 23(b)(2), and damages, Rule 23(b)(3).[4] Rule 23(b)(2) permits certification when the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule

---

[4] Much of Defendants' argument misinterpreted the Plaintiffs' request for a "hybrid" class and suggested that it was barred by the *Wal-Mart* decision, which strictly enforced the distinction between a damages and an injunction class. *Wal-Mart*, 131 S. Ct. at 2557 ("we think it clear that individualized monetary claims belong in Rule 23(b)(3)").

Plaintiffs avoid that problem by proposing the certification under both Rule 23(b)(2) *and* (b)(3). Several courts have used this unique type of "divided certification." *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 898 (7th Cir. 1999); *Eubanks v. Billington*, 110 F.3d 87, 96 & n.14 (D.C. Cir. 1997); *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1157-58 (11th Cir. 1983); *Hunt v. Check Recovery Sys., Inc.*, 241 F.R.D. 505, 512-15 (N.D. Cal. 2007); *Beck v. Boeing Co.*, 203 F.R.D. 459, 466 (W.D. Wash. 2001); *accord Manual for Complex Litigation* (Fourth) § 32.42 (2011); *see Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 360-62 (1977).

23(b)(3) authorizes certification when "questions of law or fact common to class members predominate over any questions affecting only individual class members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"[T]he merits of the class members' substantive claims are often highly relevant when determining whether to certify a class. More importantly, it is not correct to say a district court *may* consider the merits to the extent that they overlap with class certification issues; rather, a district court *must* consider the merits if they overlap with Rule 23(a) requirements." *Ellis*, 657 F.3d.at 981. Nonetheless, the district court does not conduct a mini-trial to determine if the class "could actually prevail on the merits of their claims." *Id.* at 983 n.8; *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO v. ConocoPhillips Co.*, 593 F.3d 802, 808 (9th Cir. 2010) (citation omitted) (court may inquire into substance of case to apply the Rule 23 factors, however, "[t]he court may not go so far . . . as to judge the validity of these claims.").

When the court must determine the merits of an individual claim to determine who is a member of the class, then class treatment not appropriate. *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 672-73 (N.D. Cal. 2011); 5 James W. Moore, *Moore's Fed. Practice* § 23.21[3][c] (2011).

"The amount of damages is invariably an individual question and does not defeat class action treatment." *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975); *Stearns v. TicketMaster Corp.*, 655 F.3d 1013, 1026 (9th Cir. 2011) (citing *Blackie* in a case decided after the *Wal-Mart* and *Ellis* decisions); *In re Washington Mutual Mortgage-Backed Sec. Litig.*, — F.R.D. —, 2011 WL 5027725, at *7 (W.D. Wash. Oct. 21, 2011) (same).

**B. Analysis**

The Court concludes that Plaintiffs' motion does not satisfy the commonality requirement of Rule 23(a)(1)(2) and thus the Court does not discuss the other requirements in detail.

Plaintiffs contend they have identified sufficient common questions of fact and law,

1  such as whether Defendants provided Spanish loan documents to customers who
2  principally spoke Spanish and whether Defendants violated the CDDTL by requiring
3  employees to always review the terms of the agreement in English.  "The existence of
4  shared legal issues with divergent factual predicates is sufficient" to satisfy the
5  commonality element of Rule 23(a)(2).  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019
6  (9th Cir. 1998).  Plaintiffs assert that Defendants' admission that they did not print a
7  Spanish document until October 2009 establishes that they violated the statute on a
8  classwide basis before that time.  Yet, common questions remain even after October 2009
9  because Defendants require the customer to request a Spanish form and those forms are
10 only available in 88 stores.  The predominate issue is whether the Defendants' policy of
11 explaining terms in English violates the CDDTL. Plaintiffs argue the issues can be decided
12 through common proof because the same corporate policy applies to all customers.  Though
13 some individualized inquiry is necessary to determine the members of the class, the task
14 can be accomplished by having each claimant file a sworn affidavit that he or she
15 conducted the transaction primarily in Spanish yet received an English contract.

16         To meet the prerequisite of class certification under Rule 23(a)(1)(2), Plaintiffs must
17 show that "there are questions of law or fact common to the class."  The Supreme Court's
18 *Wal-Mart* decision clarified the focus of this inquiry.  It is not enough to list several
19 questions, such as whether the defendant violated the same statute with a uniform corporate
20 policy.  *Wal-Mart*, 131 S. Ct. at 2550-51.  "Their claims must depend upon *a common*
21 *contention . . . that is capable of classwide resolution* – which means that determination of
22 its truth or falsity will resolve an issue that is central to the validity of each one of the
23 claims in one stroke."  *Id.* at 2551 (emphasis added).  "'What matters to class certification
24 is not the raising of common questions – even in droves – but, rather the capacity of a
25 classwide proceeding to generate common *answers* apt to drive the resolution of the
26 litigation.'" *Id.* (citation and alteration omitted).  "[C]ourts have been unwilling to find
27 commonality where the resolution of 'common issues' depends on factual determinations
28 that will be different for each class plaintiff." *Forman v. Data Transfer, Inc.*, 164 F.R.D.

400, 403-04 (E.D. Pa. 1995); *cf. Hanlon*, 150 F.3d at 1022 (in context of Rule 23(b)(2), stating: "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis.").

The problem with Plaintiffs' proposed class is that "proof of commonality necessarily overlaps" with Plaintiffs' claim on the merits that Spanish loan documents were not given to customers who principally spoke Spanish during their transactions. *See Wal-Mart*, 131 S. Ct. at 2552. The only way to determine if a specific customer principally spoke Spanish is to evaluate the particular transaction. The merits of a customer's claim dovetails precisely with their membership in the class, thus, the commonality requirement is not met. *See id.*; *Crosby v. Soc. Sec. Admin.*, 796 F.2d 576, 579-80 (1st Cir. 1986) (the standard of statute, "within a reasonable time," "makes class members impossible to identify prior to individualized fact finding and litigation"); *Forman*, 164 F.R.D. at 403-04 (class definition "requires addressing the central issue of liability to be decided in the case. Determining a membership in the class would essentially require a mini-hearing on the merits of each case."; "Plaintiff's proposed 'common' questions are inherently individualized, requiring inquiry into the particular circumstances of each" incident); *Metcalf v. Edelman*, 64 F.R.D. 407, 409 (N.D. Ill. 1974) (denying class when definition "calls for a conclusion" "before an adequate determination can be made of who is a class member").

Each potential class member has a unique ability to speak both Spanish and English, and that ability can range from perfect fluency, through a mix of "Spanglish," to none. Because of the wide range of language skills, it is impossible to classify which customers "principally spoke" Spanish without also determining if their individual claim has merit. Even though each proposed member will rely on the "*same* theory of recovery," the claims must be resolved on a transaction-by-transaction basis. *Liberty Lincoln Mercury v. Ford Mktg. Corp.*, 149 F.R.D. 65, 76 (D.N.J. 1993). Each customer will have a different experience with Defendants' corporate policy based on facts unique to that individual.

There is "no cohesion among the members" because their individual experiences were quite varied. *See Stearns*, 655 F.3d at 1019. Any exploration of what was said in Spanish by each customer and teller is necessarily fact intensive. This case is more like *Wal-Mart*, 131 S. Ct. at 2551, where the Court found that the dissimilarities in the proposed class "impeded the generation of common answers" rather than justified resolution based on common evidence.

The problem also raises due process concerns. The Court agrees with Defendants that they are entitled to examine the individual customers. The contradictions between Rodriguez's memory of events and the employee who assisted her illustrates that credibility is a critical issue. *Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 252 (C.D. Cal. 2006) (denying class certification motion when individual questions of credibility involved).

The Court tried to find a published or even unpublished case involving a similar situation to the CDDTL but the research indicates that class actions are feasible when the defendant's conduct is uniform and the plaintiff's conduct is not an issue. For example, in *Abels*, 227 F.R.D. at 544, each member of the class received the identical form letter; therefore, the defendants had engaged in "standardized conduct" toward members of the proposed class. *Accord Aho v. AmeriCredit Fin. Servs., Inc.*, — F.R.D. —, 2011 WL 5401799, *2, 4 (S.D. Cal. 2011) (certifying class when standard-form notice sent to all consumers); *In re Checking Account Overdraft Litig.*, — F.R.D. – , 2011 WL 5873389, *7 (S.D. Fla. 2011) (certifying consumer class against bank's "standardized, automated process" to re-sequence withdrawals from highest-to-lowest amounts to maximize overdraft penalties); *Johnson v. General Mills, Inc.*, — F.R.D. —, 2011 WL 4056208, *2 (C.D. Cal. 2011) (certifying UCL consumer class when all members were "misled by a common advertising campaign that had little to no variation"); *Palmer v. Stassinos*, 233 F.R.D. 546, 549 (N.D. Cal. 2006) (standard debt collection letter sent to each member). Similarly, in *In re First Alliance Mtg. Co.*, 471 F.3d 977, 985, 991 (9th Cir. 2006), loan officers memorized a script thus no inquiry into "the specific details of oral communication" was required. By contrast, the CDDTL focuses on the specific details of the *customer's* oral communication.

1  The answer to that question varies by individual and cannot be decided on a classwide
2  basis. *Wal-Mart*, 131 S. Ct. at 2551, 2555, 2560. Plaintiffs' case is limited to an individual
3  action(s) by the specific language of the statute, which applies to the language "principally"
4  used in any oral discussions or negotiations. This begs for case-specific and case-by-case
5  examination and is not conducive to class action treatment. Had the statute referred to the
6  unqualified "use" of a language other than English, then a different result might occur.

7  Plaintiffs suggest that the Court could certify an injunction class to determine
8  liability, then send a notice to potential class members who would then self-identify with
9  sworn affidavits that they principally spoke Spanish when they took out payday loans at
10 Defendants' stores.

11 The Court considered but rejected this approach. *Baby Neal v. Casey*, 43 F.3d 48,
12 58 (3d Cir. 1994) (Rule 23(b)(2) class seeks "to define the relationship between the
13 defendant and the 'world at large'"); *Holmes*, 706 F.2d at 1155-57 ("Even class members
14 who opted out could not avoid the effects of the judgment. A (b)(2) injunction would
15 enjoin all illegal actions, and all class members would necessarily be affected by such
16 broad relief."); *see Manual for Complex Litigation* § 32.42 ("Less precision is required in
17 the definition of a Rule 23(b)(2) class"); *id.* § 21.222 (stating that definition of Rule
18 23(b)(3) class must be "precise, objective, and presently ascertainable" while a Rule
19 23(b)(1) or (b)(2) action "may not" because no notice is required). Commonality is a more
20 significant concern for a Rule 23(b)(3) class action seeking damages because that rule
21 requires that common issues "predominate" over individual issues; however, an injunction
22 class must meet the Rule 23(a) prerequisite by raising a common question of law or fact.
23 Even if the Court could certify an injunction class, problems remain. Both the CDDTL and
24 the UCL permit injunctive relief. One form of relief could be to require Defendants to
25 return fees on loans when Defendants violated the language provision. But the proper
26 amount could only be decided by evaluating each transaction to ensure that the particular
27 customer was entitled to restitution because their rights had been violated in specific loan
28 transactions. *See Crosby*, 796 F2d at 579-80 (statutory right to "timely" notice could be

remedied in individual actions, but not by class injunction); *see also Mazur v. eBay Inc.*, 257 F.R.D. 563, 567-58 (N.D. Cal. 2009) (disavowing any reliance on self-identification when plaintiffs failed to propose an objective system to screen those who were actually injured)).

### C. Joinder of Additional Plaintiffs

Having considered the merits of Plaintiffs' CDDTL and UCL claims for the purpose of deciding whether to certify a class, *Ellis*, 657 F.3d at 981, the evidence shows that Plaintiffs have a creditable claim. The declarations filed by 25 other customers from stores throughout California, the observations of the investigators who visited the stores, and the findings of the Department of Corporations that Defendants did not comply with the statute suggest that Rodriguez is not the only customer with the same concern. There is a strong public policy to protect consumers who may recover only paltry sums and lack the incentive or resources to hire an attorney, and to deter violations of the law. *Abels*, 227 F.R.D. at 546. Nonetheless, factual disputes and credibility questions surround Rodriguez's claim that she principally spoke Spanish with the Defendants' employee. Moreover, Defendants have a right, grounded in principles of due process, to cross examine those customers who claim they predominately spoke Spanish when they obtained their payday loans. It also remains to be seen if the Defendants' policy of explaining the terms in English, placing the onus on the customer to request a Spanish form, and distributing Spanish form after October 2009 to only 88 of its stores complies with the CDDTL. This legal question is one of first impression. The Court is not aware of any California cases that have interpreted the statute, and Defendants certainly have room to argue they have not violated the statute and that their conduct is not unfair.

These circumstances persuade the Court that Plaintiffs should have the opportunity to consider whether it would be feasible to add named plaintiffs to the pending litigation. Counsel has already identified 25 potential plaintiffs. The Court will allow Plaintiffs, at their choice, to file an appropriate motion to add these 25 potential plaintiffs and any others who have been identified who are in the same situation as Plaintiff Rodriguez. *E.g.*, Fed.

1  R. Civ. P. 15, 19, 20.  The Court expresses no opinion on the outcome of any motion.
2  Whether any such relief is proper under the Rules will depend upon the persuasiveness of
3  the arguments in support of and against any late additions.  If Plaintiffs elect to file such a
4  motion, it shall be filed no later than **January 27, 2012**, and may include only the potential
5  new plaintiffs they have identified as of that date.  Plaintiffs shall contact chambers to
6  obtain a hearing date for the motion.  (If Plaintiffs file a motion, the Court will continue the
7  pretrial conference to allow time for the motion to be fully briefed and decided before the
8  parties begin preparing for trial.)
9  **III.  Remaining Pretrial Dates**
10        In the Order resolving the summary judgment motions, the Court instructed the
11 parties to contact Magistrate Judge McCurine and request a Third Amended Scheduling
12 Order that will include a mandatory settlement conference and the dates necessary to
13 prepare for a pretrial conference.  At the hearing, the parties requested the Court to modify
14 that Order since the case is ready for a bench trial.
15        The Court grants that oral motion.  With the exception that the parties shall schedule
16 a mandatory settlement conference with Magistrate Judge McCurine, the Court will not
17 require the preparation of another scheduling order.  The Pretrial Conference will be held
18 on **Friday, April 6, 2012 at 1:30 p.m.** in Courtroom 12.  The parties shall read and comply
19 with the undersigned's chamber's rules as well as the Federal and Local Rules governing
20 pretrial procedures.  *See* Local Civ. R. 16.1(f).  The parties shall follow the time schedule
21 in the Local Rules for the steps necessary to prepare for the Pretrial Conference.
22                                              **Conclusion**
23        Upon due consideration of the memoranda and exhibits, the arguments of counsel,
24 and for the reasons set forth above, the Court (1) DENIES Defendants' motion to strike [#
25 142]; and (2) DENIES Plaintiffs' motion to certify a class [# 130].  The Court requests
26 Magistrate Judge McCurine to schedule a mandatory settlement conference at his
27 convenience.  The Court grants Plaintiffs leave to file a motion, on or before **January 27,**
28 **2012**, to join additional plaintiffs.  The Court schedules the Pretrial Conference for **April 6,**

1  **2012 at 1:30 p.m.**
2  **IT IS SO ORDERED.**
3
4  DATED: December 9, 2011
5
6  Hon. Anthony J. Battaglia
   U.S. District Judge
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28